## No. 11,868.

TRINCHERA RANCH COMPANY, ET AL. *v.* TRINCHERA IR-
RIGATION DISTRICT.

Decided March 26, 1928.

Proceeding to change point of diversion of irrigating
water.  Decree for petitioner.

### *Reversed.*

1.  WATER RIGHTS—*Change of Point of Diversion.*  A change in the
    point of diversion of water may be lawfully made only under
    a decree of court permitting it.

2.      *Apparent Ownership.*  One seeing water running through an ir-
    rigating canal is justified in assuming that it is being lawfully so
    carried.

3.      *Change of Point of Diversion—Objections.*  Although a person
    may have knowledge that a ditch has changed its point of diver-
    sion from the natural stream without legal authority, if there is
    no interference with his rights, there is no occasion for objection
    on his part.

4.      *Change of Point of Diversion—Abandonment—Non-use.*  The ques-
    tion of abandonment cannot be determined in a proceeding to
    change the point of diversion of water, but the question of use
    or non-use may be considered, as may also the fact, if it be a
    fact, that less than the decreed volume had been used prior to the
    application for the change.  Such evidence bears upon the ques-
    tion whether, if the change be decreed, it will necessarily or prob-
    ably result in an enlarged use of the water.

5.      *Change of Point of Diversion—Burden.*  In a proceeding to
    change the point of diversion, the burden is upon the petitioner to
    establish the fact that the proposed change will not injuriously
    affect the vested rights of other appropriators.

6.      *Change of Point of Diversion—Irrigation Districts.*.  In proceed-
    ings to change the point of diversion, water districts are governed
    by the same law and are required to conform to the same procedure
    that apply to private persons.

7.    *Change of Point of Diversion—Evidence.* Matters of evidence which may be considered in proceedings to change the point of diversion, enumerated.

8.    *Change of Point of Diversion—Issue.* In proceedings to change the point of diversion, the question is not whether petitioner will be benefited, but whether vested rights of protestants will be injuriously affected.

9.    IRRIGATION DISTRICTS—*Purpose—Increased Irrigated Area.* The purpose of the organization of irrigation districts is to increase the irrigated area, and that this is the object of a district in seeking to change the point of diversion of water is a reasonable inference.

10.    EVIDENCE—*Knowledge of Judge.* The personal knowledge of the trial judge cannot take the place of evidence.

*Error to the District Court of Costilla County, Hon. Jesse C. Wiley, Judge.*

Mr. RALPH L. CARR, for plaintiffs in error.

Messrs. MOSES & ELLITHORP, for defendant in error.

*Department Two.*

MR. JUSTICE BUTLER delivered the opinion of the court.

THE Trinchera Irrigation District, the plaintiff below, referred to in this opinion as the petitioner, obtained a decree permitting it to change thirteen points of diversion on three creeks in Water District No. 35, in Costilla county. The Trinchera Ranch Company and others, defendants below, referred to in this opinion as the protestants, seek a reversal of that decree as to twelve of such changes. The three creeks have their rise in the Sangre de Cristo mountain range; the Trinchera flows to the west; the Sangre de Cristo lies to the north and flows first in a westerly direction, then to the southwest, then to the west, where it joins the third creek, called Ute creek, which flows from the northeast. Farther to the west, the waters of both streams flow into Trinchera creek.

/

The Trinchera Irrigation District, the petitioner, was formed some sixteen years ago. Of the total amount of water rights decreed on Trinchera creek, 585.07 cubic feet, the petitioner acquired rights amounting to 552.24 cubic feet; of the total amount of water rights decreed on Sangre de Cristo creek, 264.03 cubic feet, the petitioner acquired rights amounting to 253.36 cubic feet; and of the water rights decreed on Ute creek, 267.43 cubic feet, the petitioner acquired rights amounting to 236.43 cubic feet. Of the total water rights decreed on the three creeks, 1116.53 cubic feet, the petitioner acquired rights amounting to 1042.03 cubic feet. The remaining rights, 74.50 cubic feet, are owned by others, including the protestants, such holdings being distributed thus: On Trinchera creek, 32.83 cubic feet; on Sangre de Cristo creek, 10.67 cubic feet; on Ute creek, 31 cubic feet.

Among the rights acquired by the petitioner are the following:

*On Trinchera creek*—T. J. Tobin ditch, priority No. 5, of date May 1, 1864, 2.66 cubic feet; Walsen ditch No. 3, priority No. 7, of date June 1, 1867, 3 cubic feet; Ford ditch, priority No. 8½, of date Nov. 15, 1867, 3.33 cubic feet; Valdez ditch, priority No. 29, of date May 1, 1875, 4 cubic feet; Patrick Breen ditch, priority No. 9, of date May 31, 1869, 5.33 cubic feet; Arragon ditch, priority No. 14, of date May 1, 1871, 1 cubic foot; Le Testu ditch, priority No. 17, of date April 30, 1872, 4 cubic feet; Walsen ditch No. 2, priority No. 34, of date May 31, 1879, .83 cubic feet.

*On Sangre de Cristo creek*—John Francisco ditch, priority No. 3, of date May 31, 1863, 8.66 cubic feet; Martin ditch, priority No. 38, of date March 2, 1886, 2 cubic feet.

*On Ute creek*—Amended Ute Creek Highline ditch, priority No. 79, of date August 30, 1910, 47.10 cubic feet.

Across Trinchera creek the petitioner built a dam, thereby impounding the waters of the creek in what is called the Mountain Home reservoir, to the east of the ditches we have just described as taking water from

Trinchera creek. Water from the reservoir is discharged into two large canals, heading on the south side of the creek, a short distance below the reservoir; the Trinchera Highline canal and the Trinchera canal, both owned by the petitioner, and used by it to carry water to a large acreage lying to the south and west.

The petitioner owns another large canal, the Sangre de Cristo ditch, heading on the south side of Sangre de Cristo creek, running in a southwesterly direction, and used to carry water to a large acreage.

On the north side of Ute creek, the petitioner has the Amended Ute Creek Highline ditch, already referred to, and the Brown ditch and the Lindley ditch.

The petitioner also has other ditches, but they are not involved in this litigation.

The decree changed to the headgate of Trinchera Highline canal the full decreed priorities from the headgates of the T. J. Tobin, Walsen No. 3, Ford and Valdez ditches on Trinchera creek; and to the headgate of the Trinchera canal the full decreed priorities from the headgates of the Patrick Breen, Arragon, Le Testu and Walsen No. 2 on Trinchera creek. The distance upstream from the headgate of the Patrick Breen ditch to the point to which the change was made is about 3½ miles. The other headgates are much closer to the new points of diversion.

The decree also changed to the headgate of the Sangre de Cristo ditch the full decreed priorities from the headgates of the Martin and John Francisco ditches on Sangre de Cristo creek, a transfer upstream of ⅝ of a mile in the former case, and of about 2 miles in the latter case.

The decree also changed to the headgate of the Brown ditch 20 cubic feet of the priorities of the Amended Ute Creek Highline ditch, and to the headgate of the Lindley ditch 15 cubic feet of the priorities of the Amended Ute Creek Highline ditch on Ute creek; a change downstream of 2½ miles in the former case, and of 4 miles in the latter case.

The protestants, who are objecting to the changes, are all junior appropriators upon the several creeks. The headgates of their ditches are above the headgates of the canals and ditches owned by the petitioner.

"The evidence," says counsel for the protestants, "was badly confused in its presentation." In their brief resisting the application for a supersedeas, counsel for the petitioner say: "Due to the fact that the entire history of the Trinchera Irrigation District was very familiar to the presiding judge and also to Mr. Frank B. Webster, who appeared as one of the attorneys for the Protestants in the lower Court, both of whom had at one time or another been attorneys for the district, and with each of whom its trials and tribulations were a twice-told tale, the hearing in the court below was rather informal and the record is therefore somewhat confusing. Much was taken for granted, much was admitted, but due to the circumstances above referred to the bill of exceptions is not as clear as it might be as to just what those admissions were."

An additional burden, therefore, is imposed upon this court.

The headgates of some of the ditches described in this opinion, and even some of the ditches themselves, disappeared before the petitioning district was organized about sixteen years ago. Bean, a witness for the petitioner, testified that he has lived in the district ever since it was organized; that he is farming on the Sangre de Cristo; that the Trinchera runs through his ranch; that he has been interested in the district's water supply during his entire residence there. Asked what he knows about any water being used from the T. J. Tobin ditch, or the Walsen No. 1 or No. 3, or the Patrick Breen, or the Arragon or the La Testu, "or any of those old priorities," he answered: "I didn't see any brand on any of it. I know some of the ditches. The old Tobin ditch—what they told me was the Tobin—comes out of the Trinchera in section 33. I plowed it up in 1910. And

a ditch on the Sangre is still there. Don't know the other ditches mentioned, and have lived there sixteen years last April [1926]. No water was carried in those ditches that time, as they were plowed up." Upon the construction of its canals, the petitioner ceased the use of practically all the small existing ditches, and carried through its canals whatever water it used. The petitioner claims, and the protestants deny, that at all times since the district was organized it has used, through its canals, all the water decreed to the small ditches. If it did so use it, it disregarded the law, which requires a decree of court permitting the change of the point of diversion. C. L., sec. 1706; *Ironstone Ditch Co. v. Ashenfelter,* 57 Colo. 31, 140 Pac. 177; *New Cache la Poudre Irr. Co. v. Water Supply and S. Co.,* 29 Colo. 469, 68 Pac. 781; *Farmers' High Line and Res. Co. v. Wolf,* 23 Colo. App. 570, 131 Pac. 291. The petitioner says that the protestants did not object to such practice. It does not appear that they knew of it. The water has no ear-marks, no brand, by which water belonging to one ditch can be distinguished from that belonging to another ditch. When the plaintiffs in error saw water running through the petitioner's canals, they would be justified in assuming that it was water that the petitioner had a lawful right to carry through its canals; they were not charged with notice that the petitioner was disregarding the law by changing the points of diversion without having obtained a decree of court permitting such changes. But even if they possessed knowledge of such unauthorized changes of points of diversion, they enjoyed the use of all the water they needed during all the years prior to 1925, and, as their rights were not interfered with, they had no occasion to object. The evidence introduced by the petitioner to sustain its claim of use is merely the broad, general statements of witnesses that every year since its organization the petitioner applied to beneficial use all the water it was entitled to. But its secretary (Weaver) admitted that he has no record of the water used. In answer to

leading questions by counsel for the petitioner, Payne, one of its directors, said that the petitioner "has diverted all of the water for which it has decrees and for which it is petitioning a change. It has been used for irrigation purposes." But on cross-examination, he stated that he is not personally connected with the distribution of water; that he only knew "through the superintendent"; that he did not go out and see how much water was diverted into the ditches; that he cannot testify of his own knowledge that all the water "mentioned in these decrees" was turned into the ditches; that he went over the district just casually; and that all he knows is what the superintendent and ditch riders reported. There is no evidence that prior to 1925 the petitioner specifically called for the water represented by these old decrees. It did not call for the water decreed to any of the ditches in question, specifying either the ditch or its priority number. Apparently, the practice was somewhat loose.

Calkins, a witness for the protestants, testified that he is, and for thirteen years has been, the water commissioner, and was deputy water commissioner for two years before that; that prior to 1925 he let the petitioner distribute what water was available for its decrees, as long as it did not interfere with prior rights; that 1925 "was the first year we had to come down to priorities"; that the water run in the Trinchera canal was No. 40, and was not considered water of any of these early priorities; that it did not become a matter of priority "until you shut off the other priorities to serve other ditches"; that he never interfered with the petitioner's water further than it affected private rights; that in 1925 he "told them if they expected to use those decrees they had to establish a headgate where the decrees were for, and I would serve them"; that thereupon they established one headgate on Walsen No. 1 ditch "and called for their decrees." It appears, from the testimony of other witnesses, that such headgate was the common headgate for

four ditches; the Walsen No. 1, T. J. Tobin, Ford and Valdez. It appears also that 1925 was a year of shortage of water, the first year that the water commissioner had to enforce priorities.

The witness (Calkins) also testified as follows: "The first time I brought up the matter of these old water rights was in 1914, just prior to the so-called Pyke adjudication. I received a notice of the readjudication of the water rights, and I went before their board with a list of those ditches they were not using, see, and I told them those water rights were available, but no water commissioner could protect them under those rights without they established their headgate and made use of the water at the original points of diversion; or, if they insisted on using it in any other ditches, they had to change the point of diversion. And I have furnished them at different times with a list of the ditches, and told them they should do that. Q. First in 1914? A. Yes, sir. Q. And how many times after that up to 1925? A. Half a dozen times I prepared a list of the ditches and handed to them. Q. Then from 1914, when you first asked them to establish a headgate, up to 1925, when they did establish a headgate, did they ever establish a headgate at this point? A. No. Q. And you never diverted any water thru any of those points during that period until 1925? A. No."

Referring to the use of the decreed water, Weaver, the petitioner's secretary, said, "We haven't used it where the decrees called for"; whereupon counsel for the petitioner remarked, "I didn't ask you that."

From the remarks of the judge during the trial, it is clear that he considered the evidence of non-use as outside the issues; that at most, such evidence is merely one step in the proof of abandonment; and that in proceedings for change of point of diversion, the question of abandonment is not involved and cannot be considered. We have held that in such a proceeding, though the question of abandonment cannot be determined, the question of use or non-use may be considered. *Hoehne Ditch Co.*

*v. Martinez,* 71 Colo. 428, 207 Pac. 859; *Baca Ditch Co. v. Coulson,* 70 Colo. 192, 198 Pac. 272. The fact that less than the decreed volume had been used prior to the application for change of point of diversion may be considered. Such evidence bears upon the question whether, if the change were granted, it would necessarily, or probably, result in an enlarged use of the water. *Fort Lyon Canal Co. v. Rocky Ford Canal, etc., Co.,* 79 Colo. 511, 246 Pac. 781.

We have held repeatedly that, in a proceeding to change the point of diversion, the burden is upon the petitioner to establish the fact that the proposed change would not injuriously affect the vested rights of other appropriators. *Baca Ditch Co. v. Coulson,* 70 Colo. 192, 198 Pac. 272; *Hoehne Ditch Co. v. Martinez,* 71 Colo. 428, 207 Pac. 859.

In their brief, under the heading, "Burden of Proof," counsel for the petitioner say: "Before taking up this phase of the matter, we desire to call the court's attention to the fact that this is not an ordinary proceeding between individuals, and to urge that the expressions used by our appellate courts, so much relied upon by counsel for plaintiffs in error, can have but little bearing in a case of this kind, where a public corporation, such as defendant in error is, owns practically all of the water of the streams and is charged with the duty of distributing it to the land owners within the district who are paying the maintenance and bonded indebtedness taxes levied and assessed upon their lands."

An irrigation district has broad powers, including that of condemnation; but when it comes to changing a point of diversion, it is governed by the same law, and is required to conform to the same procedure, that apply to private persons; and in such proceeding, it has the same right as, and no greater right than, the humblest appropriator upon the stream.

In such proceeding, in order to enable a court to determine whether or not the proposed change would in-

juriously affect the vested rights of junior appropriators, certain *data* are of importance, e. g., the size and capacity of the ditches from which and to which the change is sought; the quantity of water used, and the quantity it is intended to use after the change; the place where and the acreage upon which the water was used, and the place where and the acreage upon which it is intended to use the water after the change; the periods of non-use between successive irrigations of the land; the time of intended future use; excessive use, if any; the character of the soil at the place of present use, and at the place of future use; the kind of crops raised at the place of present use, and, so far as it is practicable to state it, the kind of crops intended to be used after the change is made. Scarcely any of these matters are in evidence here. Not that all, or even a large part, of such matters must be proven in order to show that the vested rights of others would not be prejudiced by the change; but much more is required than has been proven in the present case. It may fairly be said that here there is no proof whatever of matters absolutely necessary to enable a court to find that the vested rights of the protestants would not be injuriously affected if the proposed changes were permitted. Reilly, a civil engineer, testified for the petitioner. He prepared a map (Exhibit B) based, not upon personal knowledge of the ground, but upon decrees and records. He expressed the opinion that, "From an economical standpoint a combination of the water interests rather than being diverted through a number of small canals and thereby creating greater seepage and loss by evaporation, it would be a more economical method to handle it. There is no question about the enhanced use of water in a combined system, and I think it applies in this case as well as any other in the valley." He also testified that he thinks that his knowledge of this particular locality is sufficient to enable him to say that "it would be more economical, and that the water could be better conserved by this concentration." The question, however,

is not whether the district as a whole would be benefited
—no doubt it would be—but whether in so benefiting the
district as a whole, the vested rights of the protestants
would be injuriously affected.  With reference to a some-
what similar situation, Mr. Justice King, in *Monte Vista
Canal Co. v. Centennial Irrigating Ditch Co.*, 24 Colo.
App. 496 (135 Pac. 981), made this pertinent observation
(pages 504–5):  "We may readily concede the correct-
ness of the views expressed by the learned trial judge,
that, as a whole, the vast territory irrigated or to be irri-
gated from the Rio Grande river may be benefited in
general by the application of water during flood seasons
to the largest possible area of irrigated lands; that there-
by the soil of the entire area becomes a vast reservoir
from which the water has a tendency to return slowly to
the stream at some point in its course, and thereby many
more acres, as a whole, may be irrigated than if the water
were permitted to run off; but the fact that many more
acres and people may be served by this means of storage
cannot avail as against the injury to protestants in this
case, whose junior decreed rights are shown to be in-
juriously affected."

The ditches from which the changes are sought to be
made in this case are small, or were so when they were
in existence.  The acreage served by them, when they
were in existence, must have been greatly limited—the
evidence does not aid us with even an approximate esti-
mate thereof.  Shannon, a witness for the protestants,
lives at the Trinchera ranch.  Speaking of the situation
with reference to the small ditches on Trinchera creek,
he testified:  "If it [the water] was used on land it was
appropriated for, they can use it only a certain length
of time, because it is next to the creek and they can only
use it so much.  But if they put it out into the Trinchera
canal, they can use it on a larger acreage and I don't get
it.  All the ditches that run down along the creek bed
don't require much water."

The approximate number of acres in the district is 56,000, of which only 15,000 to 20,000 acres have been irrigated thus far. That it is the intention to substantially increase the number of irrigated acres, is a reasonable inference; that is the very purpose for which irrigation districts are organized. The map (Exhibit B) shows that the Trinchera canal, the Trinchera Highline canal, and the Sangre de Cristo ditch carry the water to the uplands far from the creeks. Mr. Justice King, delivering the opinion of the court in *Farmers' High Line and Res. Co. v. Wolf,* 23 Colo. App. 570, said (page 581): "It is a matter of common knowledge that, except on streams in which the appropriations have not exceeded the constant supply, few instances arise in which the change of place of diversion of large quantities of water, for a long distance, can be made without substantial injury to juniors, and the utmost care and scrutiny [should be exercised] to guard against such injury."

The present case was carelessly presented at the trial. No doubt counsel for the petitioner correctly states the situation when he says that because of the personal knowledge of the judge and of counsel with the history of the district, the hearing was rather informal and the record somewhat confusing, and that much was taken for granted. Of course, the personal knowledge of the judge cannot take the place of evidence. *Monte Vista Canal Co. v. Centennial Irrigating Ditch Co.,* 24 Colo. App. 496, 505, 135 Pac. 981. It may be that the trial judge was misled, as was the trial judge in *Fort Lyon Canal Co. v. Rocky Ford Canal, etc., Co.,* 79 Colo. 511, 518, 246 Pac. 781, by the decision in *New Cache la Poudre Irr. Co. v. Water Supply and S. Co.,* 74 Colo. 1, 218 Pac. 739. Our opinion in the Fort Lyon case, explaining the New Cache la Poudre decision, was not published until after the trial of this case. Be that as it may, it is evident that the trial judge in this case eliminated from consideration the question of non-use of water, which has an important bearing upon the question of whether the changes sought

by the petitioner would necessarily, or probably, result in an enlarged use of the water, in volume or in time, or in both.

The Ute creek situation presents an additional question. The decree permitted two changes of diversion from the headgate of the Amended Ute Creek Highline ditch; one, of 20 cubic feet, to the headgate of the Brown ditch, 2½ miles down the creek, and the other, of 15 cubic feet, to the headgate of the Lindley ditch, a distance of 4 miles down the creek. There was evidence tending to show, and the court found, that below the headgate of the Amended Ute Creek Highline ditch the bed of the creek is of an extremely porous nature, consisting largely of loose sand and gravel, and that there is an appreciable loss of water by seepage between the point from which and the points to which the changes were decreed. The court was unable to find the extent of such loss, but granted the application for such changes upon condition that in times of scarcity of water the water be measured at the point of the present headgate of the Amended Ute Creek Highline ditch. As this places upon the petitioner the total loss by seepage, it would seem that this fully protects the protestants against injury by reason of loss of water by seepage. However, this solves but one of several problems presented by the petitioner's application for change of points of diversion on Ute creek. Some of the matters discussed in another part of this opinion apply here also, but only to a limited extent.

The judgment must be reversed. If a further hearing is desired, the evidence already introduced may be considered, and further evidence may be introduced by the parties to the proceeding. If the petitioner does not elect to introduce additional evidence, the lower court is directed to find the issues for the protestants, and to enter judgment accordingly.

The judgment is reversed.

MR. CHIEF JUSTICE DENISON, MR. JUSTICE ADAMS, and MR. JUSTICE CAMPBELL concur.