## No. 15,313.

### IRELAND *v.* HENRYLYN IRRIGATION DISTRICT.
(160 P. [2d] 364)

Decided June 18, 1945.

Mr. CLARENCE L. IRELAND, for plaintiff in error.

Mr. WILLIAM W. GAUNT, for defendant in error.

MR. JUSTICE JACKSON delivered the opinion of the court.

PLAINTIFF, as owner, or assignee of the owner, of three reservoirs, known as Moonshine, Ireland No. 1 and Ireland No. 5, on Box Elder Creek in Adams county, brought suit for over $30,000 in damages against defendant as the owner of the Bootleg reservoir—upstream from plaintiff's reservoirs—and Hudson-Denver canal, alleging negligence in their operation, as a result of which the dams of all three of plaintiff's reservoirs were broken and washed away during the course of a flood. After a seven day trial to the court, judgment was entered in favor of the defendant, and plaintiff comes here on writ of error. Reference will be made to the parties as they appeared in the trial court.

Defendant's Bootleg reservoir remained intact, except for the changes to the spillway, hereinafter described, made by its agents and employees during the course of the flood, and its dam did not break. The trial court held that defendant was neither liable under the general rules of negligence, nor under the Colorado statutes fix-

ing liability of reservoir owners for damages, i.e., sections 82 and 91, chapter 90, vol. 3, '35 C.S.A., which read as follows:

"§82." "The owners of the reservoirs shall be liable for all damages arising from leakage or overflow of the waters therefrom or by floods caused by breaking of the embankments of such reservoirs."

"§91." "None of the provisions of sections 83 to 92 of this chapter shall be construed as relieving the owners of any such reservoir from the payment of such damages as may be caused by the breaking of the embankments thereof, but in the event of any such reservoir overflowing, or the embankments, dams, or outlets breaking or washing out, the owners thereof shall be liable for all damage occasioned thereby. [L. '99, p. 316 §9; R.S. '08, §3213; C.L., §1693.]"

The trial court further held that the damage to plaintiffs was due, not to any acts or omissions of defendant, but solely to an act of God.

The contention of plaintiff is that, even granting that an act of God does relieve a reservoir owner of responsibility, yet such is the rule only when no negligence coexists (*Ryan Gulch Res. Co. v. Swartz*, 77 Colo. 60, 234 Pac. 1059), "and that if the defendant was negligent in the building or maintaining of the banks of the reservoir and that such negligence contributed to or co-operated with the act of God, the defendant cannot escape liability." *Ryan Gulch Res. Co. v. Swartz*, 83 Colo. 225, 263 Pac. 728. Both cases are based on the same facts, i.e.: damage to reservoirs lower down stream by the breaking of the dam of an upper reservoir. There, the effect of the breaking of the dam was to add the force and turbulence of the suddenly released stored water to the impetus of the floodwater. Plaintiff in the instant case maintains that, although defendant's dam did not break, it so operated its Bootleg reservoir as to release stored water at a time when the floodwaters were at their height, and that it was the combination of storage

waters and floodwaters that caused his dam to break. If such be true, then the case cited by plaintiff more nearly in point would appear to be *Inland Power & Light Co. v. Grieger,* 91 F. (2d) 811. In that case, the owner of a dam was held liable for all damage to land downstream caused by a heavy flood where, notwithstanding the fact that damage already had occurred to plaintiff's land on one day solely from the floodwaters, on the second day the owner of the dam released storage water through its outlet tubes into the floodwaters, thus increasing the water flow and damage.

Defendant's contention is that his operation of the reservoir actually mollified the effect of the flood instead of increasing it, or, in the words of the trial judge, the floodwaters were "ironed out."

Plaintiff complains of two acts at the dam committed by defendant. First, when it appeared to an official of the state engineer's office and defendant's employees that water would probably pass over its spillway (for the first time in the history of the reservoir), they enlarged the spillway in two ways: (a) by lowering it, thus allowing water to go over the spillway sooner than it otherwise would, had no change been made; and (b) by widening the spillway area to twenty feet. This work, which was begun March 17, was completed in the late afternoon of March 20, before the rising water had actually reached the height of the lowered spillway. The only basis upon which plaintiff could rightfully claim injury for this action would be on the theory that the spillway, having once been set at a higher elevation and with a narrower outlet, gave plaintiff a vested right in having it maintained in that original condition. We believe this position is untenable. We are of the opinion that plaintiff could not acquire a right against defendant to have a system of flood control in storage works located above his property that would be any better than if defendant's reservoir had never been built. The object of the statute is to

protect persons owning property below reservoirs from having their situation worsened, and not to have it improved. *Teeter v. Nampa & Meridian Irr. Dist.,* 19 Ida. 355, 114 Pac. 8. From the foregoing it is apparent that we are of the opinion that the proposition upon which plaintiff relies, that a junior appropriator of water has a vested right as against his senior to a continuation of the conditions on the stream as they existed at the time he made his appropriation, is not applicable to the situation with respect to a reservoir owner making modifications in the structure of his dam; hence the following four cases, cited by plaintiff, are not applicable to the instant proceeding: *Faden v. Hubbell,* 93 Colo. 358, 28 P. (2d) 247; *Vogel v. Minnesota C. & R. Co.,* 47 Colo. 534, 107 Pac. 1108; *Trinchera Ranch Co. v. Trinchera Irr. Dist.,* 83 Colo. 451, 266 Pac. 204; *Del Norte Irr. Dist. v. Santa Maria Res. Co.,* 108 Colo. 1, 113 P. (2d) 676.

The second action of which complaint is made occurred after water began going over the spillway at 3 a.m., March 21. When the waters still continued to rise, the spillway was further deepened to a gauge height of 20 feet from an original height of about 21 feet and widened to 85 feet. This likewise was done as a safety measure and with the approval of the state engineer's office. Plaintiff claims that this very procedure had the effect of releasing stored water (376 acre feet, in fact), which, added to the floodwater, was enough to cause the dam on plaintiff's Moonshine reservoir to go out, and that when that dam broke the accumulated waters then descended upon the two reservoirs of Ireland located below and washed them out. Defendant's position is: (1) That the water that went over the widened and deepened spillway was all floodwater and not storage water, inasmuch as the reservoir level never dropped below twenty-one feet at any time after the water flowed over the spillway until long after Moonshine reservoir dam failed; (2) That, if any stor-

age water did leave the Bootleg reservoir by reason of the changes made in the spillway, it did not descend upon Moonshine reservoir, but was drawn off through the Hudson-Denver Canal into Horse Creek reservoir on a different drainage area. The Hudson-Denver canal is an irrigating ditch, owned and operated by defendant, taking water out of the north side of the Platte river near Denver and carrying it easterly on the north side of the Platte river across Box Elder creek and easterly to Horse Creek reservoir. This canal crosses Box Elder creek at the toe of the Bootleg dam, and evidence introduced by defendant indicated that water flowing over the spillway of Bootleg reservoir, at the time it was widened, went into the Hudson-Denver canal and thence was transported in a northeasterly direction into Horse Creek reservoir.

As heretofore noted, the final enlarging of the spillway was completed during the afternoon of March 21. The Hudson-Denver canal continued to carry water from Bootleg reservoir away from Box Elder drainage area into Horse Creek reservoir until after eight o'clock in the morning of March 22, when the capacity of the latter reservoir, as well as that of the Hudson-Denver canal, had been nearly reached. The canal, being in imminent danger of overflowing, defendant took a third course of action to which objection is now made by plaintiff, but which was approved by the State Engineer at the time, namely: they cut the canal on the north side, immediately releasing water into Box Elder creek, which water thereupon mingled with the floodwater flowing down the latter and descended upon Moonshine reservoir. This water from the canal, plaintiff claims, amounted to 60 acre feet. The trial judge, in his findings, pointed out that this figure is based on the theory that the canal was completely emptied, whereas evidence showed some water was still flowing in the canal toward Horse Creek reservoir after the bank had been cut. Moonshine reservoir did not go out

until 11 p.m. March 22d. At that time the flood was still at its height and the floodwaters going over the spillway of Bootleg were not being diverted but, since the morning of March 22, had been continuously going down Box Elder Creek to Moonshine.

Both plaintiff and defendant introduced expert testimony of engineers, with elaborate statistics, attempting to prove or disprove, as the case might be, that storage water was or was not mingled with floodwater at the time of the break of Moonshine reservoir. The testimony consists of 2557 folios, on 820 pages, containing considerable material that has not been abstracted; nevertheless, we have examined this, as well as carefully studying the abstract, supplemental abstract and briefs. Engineers for the plaintiff, as stated by the trial judge, "have endeavored to approach determination of the creek flow * * * by finding and measuring the water where it went after passing Bootleg reservoir and coming back upstream with these measurements in order to determine what took place above Bootleg reservoir during the flood." The trial court then pointed out six "possible errors in attempting to go below Bootleg, measuring the water, as you say, where you find it, and then trying to relate that back upstream above Bootleg. It would seem, notwithstanding contrary testimony of opinion witnesses, that it is much better to rely upon the observations at the time right at Bootleg itself. Those observations constitute the record made at that time without any suggestion of favoritism or prejudice to either party. So we can take the figures as the state engineer reports them and as given by the district employees, and we are probably as near accurate as can be at this time."

The evidence of defendant indicated, and the court found, that, assuming that any stored water was released, it "was taken care of by its diversion * * * and it could not have been that stored water that did the damage."

562

■ It is apparent that the judgment of the trial court was based on opinion evidence of engineers that was highly conflicting, although the facts as to what actually took place, and from which the inferences of the experts are derived, were comparatively simple. In this state of the record, it becomes only necessary for us to determine whether there was sufficient competent evidence to support the judgment. We are of the opinion that there was, and the judgment is accordingly affirmed.

MR. CHIEF JUSTICE BAKKE and MR. JUSTICE ALTER concur.