[Civ. No. 15627.   First Dist., Div. Two.   Jan. 19, 1954.]

EDWARD L. SMITH et al., Respondents, v. EAST BAY
MUNICIPAL UTILITY DISTRICT, Appellant.

Harold Raines and John B. Reilley for Appellant.

Nichols, Richard, Allard & Williams and Eugene Morgan for Respondents.

KAUFMAN, J.—Appellant, East Bay Municipal Utility District, the defendant below, appeals from a judgment against it of $3,360 in a suit for damages to plaintiffs' property alleged to have been caused by an overflow of San Pablo Creek resulting from defendant utility district's negligence in the operation of San Pablo Dam and Reservoir. Judgment upon the jury's verdict in favor of plaintiffs was entered on April 7, 1952. Defendant district appeals from the judgment on the ground of the insufficiency of the evidence to support the verdict.

Plaintiffs and respondents, Edward and Florence Smith, husband and wife, are owners of a parcel of property in Contra Costa County located on both sides of San Pablo Creek, between 1½ to 2 miles downstream from San Pablo Reservoir. Respondents acquired this property in 1947. It was equipped as a recreation area with dance hall, swimming pool, dressing rooms, boathouse and merry-go-round. Respondents intended to use it as a picnic grounds. When they acquired it, there was no water in the creek. Up until January, 1947, there was

never more than $1\frac{1}{2}$ to 2 feet of water in it. The creek banks indicated that the highest level of water in the past had been about $3\frac{1}{2}$ feet. Within a day or two prior to the date of the damage, there was water coming down the channel at a depth of from 6 to 8 inches and the channel was clear of debris.

Plaintiff Edward Smith testified that damage was caused first to his swimming pool. Water had to rise to a height of 5 feet in the creek in order to flow into the swimming pool. The water rose to a height of 6 feet 6 inches in the creek. The witness' best recollection was that this occurred before January 15, 1951, it might have been as early as January 10, but it was probably between January 12 and 15. The swimming pool's filter plant was damaged by the deposit of silt. The merry-go-round was also damaged by silt deposits; two boats were damaged; and 14 cords of wood were washed away. Of the three footbridges across the creek, two were weakened, and one was washed away. Some supplies of cement and fertilizer were also damaged.

Called as a witness for defendant under section 2055, Code of Civil Procedure, Smith testified that he had purchased plank two years before for the purpose of bulkheading the creek and putting a deck on the bridge. He had built a bulkhead opposite the swimming pool and was going to build more, further up the creek. He said his purpose was for a fill for walks on the sides and so the water when it came up would not pile brush around the trees beside the creek.

Below the picnic area on plaintiffs' property is a small earth dam covered by cement about 4 feet in height. On each side of it are floodgates 5 feet square. The dam is 20 feet wide between the floodgates. If the gates were closed, water would back up 40 to 50 yards behind the dam, but prior to the damage complained of, he had opened the floodgates and secured them in this position.

Mrs. Smith's testimony as to the amount of water in the creek at all times prior to the date of the damage was substantially the same as her husband's. She stated that between January 10 and 15, 1951, the water from the creek flowed into the swiming pool for about three days, and then gradually receded.

Joseph De Costa, a civil engineer who has been employed by defendant district since 1929, is manager of the Distribution Division which has charge of the operation of the district's reservoirs, filtration and pumping plants with the exception of Pardee and Lafayette Reservoirs.

He testified that appellant district has four storage reservoirs—Chabot: total capacity 4 billion gallons; Lafayette: 7/10 billion gallons; Upper San Leandro: 13½ billion gallons; San Pablo: 14 billion gallons. Daily consumption is about 112 million gallons. The water stored in the local reservoirs can maintain the system for between six to nine months if not replenished. On January 1, 1951, available storage in Chabot, Lafayette and Upper San Leandro Reservoirs was 5 and 6/10 billion gallons; on January 15, 1951, it was 5 and 4/10 billion gallons.

Pardee Dam and Reservoir in the Sierra Nevada is the chief source of the district's water supply. Two aqueducts terminating at the Orinda Filtration Plant bring the water into the area. A maximum of 160 million gallons per day can be brought in. The amount to be brought in is determined by local consumption and available storage. It is De Costa's duty to determine how much water is to be released from Pardee into the aqueducts. Between January 1 and 15, 1951, an average of about 90 million gallons a day was taken into the aqueducts. Measurement is made by Venturi meters located in the pipe lines.

When water from Pardee is processed at the Orinda Filtration Plant, none of it goes into San Pablo Reservoir, but if consumption drops appreciably the difference between what is coming in and what is filtered goes into San Pablo Creek and into San Pablo Reservoir. Thus Pardee water will run by gravity into San Pablo Reservoir, but it must be pumped from the aqueduct into the other reservoirs in the system. Once water is in San Pablo Reservoir it cannot be transferred to any of the other reservoirs.

San Pablo Reservoir was created by the erection of a dam approximately 200 feet high and 1,200 feet in length across the stream bed of San Pablo Creek. An open spillway near the right abutment of the dam was designed to carry 4 billion gallons of water a day. The floor of the spillway is at an elevation of about 315 feet above sea level. Water begins to go over the spillway when the water in the reservoir is at an elevation of 314.98 feet above sea level. Water from the spillway runs down a cement lined ditch or trench into San Pablo Creek. At the left abutment of the dam is a diversion tunnel which goes through the dam and empties into San Pablo Creek. Water can be discharged through this tunnel only by means of gate valves which are at elevations of 265 and 290 feet above sea level, and can be used whenever there

is any head above the floor of the gate valve. No water was released through these valves between January 1 and 15, 1951. These valves are considered to be a safety factor to be used in case of earthquake or enemy action.

Water from San Pablo Reservoir is released to the San Pablo Filter Plant in El Cerrito by means of a tunnel through the Berkeley hills. It has a capacity of 54 million gallons a day. It has between 5 to 6 million gallons storage capacity for filtered water only. The amount this plant delivers into the distribution system depends on the consumption demand.

The San Pablo Reservoir is supplied by water from two sources—the local drainage area of San Pablo Creek and water from Pardee diverted at the Orinda Filtration Plant.

De Costa testified that the district's purpose is water supply and not flood control. It is therefore the policy to keep the reservoirs as full as possible as insurance against interruption of supply. He was aware early in January, 1951, that the water would very probably go over the spillway. After January 10th water was being drawn off to the San Pablo Filtration Plant at the rate of 50 million gallons a day. To have put water from Pardee into the other reservoirs would have involved costly pumping. He admitted that the district had all the water it needed in the San Pablo Reservoir without bringing in any Pardee water, and that the flow to the Orinda Plant could have been controlled so that no surplus would have flowed past into San Pablo Creek, but that no effort was made to do this. Repair work was planned in the aqueduct, and as the aqueduct was to be shut down for awhile, the plan was to keep the reservoir well filled.

The only evidence in the record on the volume of water coming into San Pablo Reservoir from the watershed and from Pardee during the time the damage occurred is that supplied by De Costa's chart and explanations thereof. For the first eight days in January the water stood at elevations between 314.81 and 314.88 feet. (Water begins to flow over the spillway at 314.98 feet.) Pardee water was being brought in at between 5.3 to 5.8 million gallons per day. San Pablo Creek was discharging water into the reservoir at rates varying from 7.6 to 25.8 million gallons. San Pablo Filtration Plant was taking between 14.9 to 23.9 million gallons. Rainfall for three days of that period was .65 of an inch, .04, .02, —on the remaining days it was none or a trace. But on January 9, 1951, the intake of Pardee water was raised from the previous average of a little over 5 million to 25.1 million

gallons. On that day there was also .97 inch rainfall, and .2 of a million gallons went over the spillway.

Venturi meters measure the amount of water taken into the filtration plants and in the aqueduct, hence an accurate measurement is possible of the amount coming into San Pablo Reservoir from Pardee, and the amount taken into the San Pablo Filtration Plant. The amount coming in by natural flow from San Pablo Creek is computed by a formula based on the rise in the elevation of the water surface of the reservoir, the draft to the San Pablo Filtration Plant and the amount coming in from Pardee. The water elevations are obtained from the continuous water level recorder. These water level readings can be taken accurately within one-tenth of a foot. The witness estimated that there would be roughly 22 million gallons in one-tenth of a foot in the reservoir.

De Costa testified that water went over the spillway every day between January 13th and 26th, except on January 15th and 16th. He explained the "ponding effect" of a dam—the fact that temporary storage is provided because on any given day less water will go over than the amount coming in, because of the necessity of the incoming water spreading over the 848 acres of the reservoir's surface.

Called as a witness for defendant, De Costa stated that if there had been no San Pablo dam, the flow of water past the point where the dam is now located would be the same as that represented on the chart as maximum two-hour inflow and that this would have flowed on past plaintiffs' property plus the run-off in the drainage area between the dam and their property. He was unfamiliar with the creek in the area of plaintiffs' property, and did not know how deep it would be flowing at the rate shown in the chart. He stated that there are 32 square miles of watershed above San Pablo Dam, and the watershed between the dam and plaintiffs' property is 3½ square miles. The records of the district showed that between July 1, 1950, and July 30, 1951, the run-off for the San Pablo watershed above the dam was 175 per cent of normal, and that of this only 8½ per cent went over the spillway and was not stored.

Appellant contends that it cannot be held liable in this action without proof of negligence. The doctrine of *Fletcher* v. *Rylands* is not followed in California (*Sutliff* v. *Sweetwater Water Co.*, 182 Cal. 34 [186 P. 766] ; 26 Cal.Jur. 154, § 358.) Respondents alleged that appellant had the

right to discharge accumulated waters in "reasonable" amounts, that defendant "did so carelessly and negligently operate, maintain, and control" its dam "so as to cause and permit an excessive amount of water to accumulate behind said dam" and that on or about January 15, 1951, they carelessly and negligently allowed a large and excessive volume of water to escape flooding plaintiffs' property and proximately resulting in damage.     Plaintiffs must first show the existence of a duty of care owed by defendant before they can show negligence (*Routh* v. *Quinn,* 20 Cal.2d 488, 491 [127 P.2d 1, 149 A.L.R. 215].) This they have attempted to do by stating that defendant had the right to discharge water in "reasonable" amounts.     Appellant argues that no such duty to discharge water only in reasonable amounts had been placed upon the owner of a dam in California, nor in any other state that has considered the question. The duty is only negative—that is, he must not augment the flow of the water in time of flood by releasing stored water.

The right to appropriate waters is limited to the waters reasonably necessary for the purpose for which appropriated. (Cal. Const., art. XIV, § 3; Cal.Wat. Code, div. 1, ch. 1, § 100.) Defendant district is an appropriator of water licensed by the state. The rights of an appropriator have been further elaborated in *Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 367 [40 P.2d 486]—the right to use water is limited to the amount reasonably required for the beneficial uses; it does not extend to waste of water; it does not extend to unreasonable use or unreasonable method of use or unreasonable method of diversion; riparian rights attach only to the amount of flow that may be used consistently with this section of the Constitution.

Appellant cites the general rule in this country that the owner of a dam may permit flood waters to pass over the dam in such quantities as flowed in. Leading cases in several jurisdictions hold in accord: *Crawford* v. *Cobb & Mitchell Co.,* 121 Ore. 628 [253 P. 3, 257 P. 16]; *Teeter* v. *Nampa & Meridian Irr. Dist.,* 19 Idaho 355 [114 P. 8]; *De Kalb County* v. *Tennessee Elec. Power Co.,* 17 Tenn.App. 343 [67 S.W.2d 555]; *Bruton* v. *Carolina Power & Light Co.,* 217 N.C. 1 [6 S.E.2d 822]. In *Ireland* v. *Henrylyn Irr. Dist.,* 113 Colo. 555 [160 P.2d 364], it was held that the downstream owner does not have the right to require the owner of an upstream reservoir to improve the downstream owner's situation by using the reservoir for flood control. (See, also,

*Iodice* v. *State,* 102 N.Y.S.2d 742, 303 N.Y. 740 [103 N.E.2d 348].)

These duties, appellant contends, are not altered by the fact that foreign waters are commingled with the natural waters of a' stream, if no more water is released than the amount natural to the flow of the stream. It has been so held in *People* v. *City of Los Angeles,* 34 Cal.2d 695 [214 P.2d 1]. That case also pointed out that Los Angeles by completing a new dam did not increase its obligation with respect to Owens Valley waters, and cited *Ireland* v. *Henrylyn Irr. Dist.,* 113 Colo. 555 [160 P.2d 364, 366], *supra,* as authority.

█ It would seem that in the absence of facts creating an estoppel, the rule to be applied in California in regard to the owner of a dam is that of the Ireland case. The case of *People* v. *City of Los Angeles* goes on to state that there would be no additional obligation ''unless the city operated the dam long enough and in such manner that lower owners could reasonably rely on the continuance of that operation.''

Respondent contends that the duty of the owner of a dam who is also an appropriator of water is set forth in *Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193 [143 P.2d 12], as well as in *People* v. *City of Los Angeles, supra. People* v. *City of Los Angeles* declares that ''The Natural Soda Products Company case established that the city, by its long continued diversion of the waters of the Owens River, incurred an obligation to continue that diversion within the reasonable capacity of its aqueduct system, at least so long as it continued to maintain its aqueduct. As between the city and the state's lessees on the lake bed such diversion was recognized as the new natural condition with respect to the waters of the Owens River.''

In the instant case water had gone over the spillway but four times in the past 35 years. All of the water from the watershed could have been stored if appellant had ceased importing Pardee water.

█ Appellant has argued that an appropriator of water is limited to the amount of water he can beneficially use, but in the Natural Soda Products Company case it was said that these constitutional and statutory provisions are to insure a reasonable division of the water supply, and do not require a particular disposition of surplus water, ''least of all a disposition harmful to the recipient.'' The constitutional mandate forbids a disposition that would waste water and damage valuable natural resources.

Where a "new natural condition" is established because of long continual diversion of water, then the dam owners' duty would appear to be as contended for by respondents. Appellant says that there is no evidence in the record that appellant held out to respondents that it would divert the entire flow of San Pablo Creek to the maximum capacity of its system. There is, however, the evidence that water went over the spillway only four times in several years, and that the high water mark on the creek bed was only 3½ feet.

Appellant contends finally that the evidence conclusively shows that defendant violated no duty toward plaintiffs, since no more water went over defendant's spillway than came into the reservoir from the natural flow of San Pablo Creek. De Costa's chart showed that more water was drawn out to the San Pablo Filter Plant every 24 hours than the amount taken in from Pardee, hence the amount of water going over the spillway could not have been increased by the foreign water.

The watershed run-off for each of the days from January 9 through January 15, 1951, is shown to be greatly in excess of the spillway discharge. Appellant says that if plaintiffs reject this evidence which they elicited from the witness under section 2055, Code of Civil Procedure, then they face a failure of proof, and if they accept it, it conclusively disproves an essential element in their case.

Respondent urges that the testimony of De Costa was disbelieved by the jury in view of the large margin of error which he admitted to in the measurement of the elevation of the water in the reservoir. He admitted to a margin of error of one-tenth of a foot or 22 million gallons. Respondents apply this to the figures for January 12th. If the elevation of the water in the reservoir is corrected to 315.02 from 315.12, then it appears that almost two-tenths of a foot of water has escaped from the reservoir in 24 hours. Fifty and five-tenths million gallons were taken out to the filteration plant, and 13.8 million gallons were brought in. The two-tenths of an inch drop represents 44 million gallons. Since the reservoir was full all of the 13.8 million gallons imported would also leave the reservoir. Therefore a total of 57.8 million gallons left the reservoir in addition to all the water coming in from the watershed run-off. Since 50.5 million went to the filtration plant, 7.3 million gallons more escaped from the reservoir than were coming in from the natural watershed. Respondent thus contends that at least on January 12th, it can be shown

that more water left the dam than came in from the natural watershed, and this would be evidence to support the verdict.

Respondent also relies on the following facts to support the verdict:

(1) Water in San Pablo Creek overflowed its banks below San Pablo Dam, damaging respondent's property.

(2) Water in San Pablo Creek above the dam did not overflow its banks.

(3) During the entire time that water passed over the spillway, appellant was putting large quantities of water into the reservoir that did not come from the natural watershed run-off.

The obvious inference is that more water passed through the creek below the dam than above, and this can only be explained by the increase in flow caused by the Pardee water.

We conclude that there is evidence in the record from which the jury could infer that more water was released from the dam than naturally flowed into the dam from San Pablo Creek. ▆▆ The appellant was under a duty toward respondents not to permit a greater flow of water over the dam than that which would naturally flow into the dam from San Pablo Creek.

The duty of the owner of a dam who is also an appropriator of the water behind the dam is clearly set forth in *Natural Soda Products Co.* v. *City of Los Angeles*, 23 Cal.2d 193 [143 P.2d 12], and a later case arising out of the operation of the same dam, *People* v. *City of Los Angeles*, 34 Cal.2d 695 [214 P.2d 1].

In *People* v. *City of Los Angeles, supra,* Justice Traynor, who also wrote the opinion in the first case, says at page 697:

"The Natural Soda Products Company case established that the city, by its long continued diversion of the waters of the Owens River, incurred an obligation to continue that diversion within the reasonable capacity of its aqueduct system, at least so long as it continued to maintain its aqueduct."

▆▆ If there is a duty incurred in that case, certainly here a similar duty was incurred by the appellant. The facts in the present case are very similar to the facts in the Natural Soda Products case. Only four times in 35 years of operation did any water pass over the spillway of the San Pablo Dam; a picture of the dam was introduced in evidence and clearly showed that it had every appearance of permanence. Respondents and their predecessors in interest, in reliance on the continued diversion of the water, had expended considerable sums in improving their property. The water that was

"imported" from Pardee, or an amount equal thereto, necessarily passed over the dam during the time that this flood occurred. It was not necessary that any of the Pardee water be put into the reservoir; therefore, all the water that came in from Pardee reservoir, or an amount equal thereto, was allowed to go over the dam without necessity. It could either have been shut off or it could have been stored in available storage space elsewhere.

Our Supreme Court aptly pointed out in *Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193 at page 197 [143 P.2d 12] that "A change in the flow of a stream that appears to be permanent usually leads to costly adjustments by those interested, as they come to regard the artificial condition as permanent. It is therefore reasonable that they should receive as much protection as if the condition were natural."

The duty imposed by the Natural Soda Products case is a duty not to unnecessarily cause or allow any water to escape from the reservoir so long as their facilities are capable of handling the water in the reservoir. The duty goes further in that it is obligated not to divert into the reservoir any foreign waters if it would necessitate discharging any water from the reservoir. Here foreign waters were diverted into the reservoir when they must of necessity have increased the amount of water being discharged from the reservoir. From these facts the jury was entitled to find negligence and breach of duty on the part of appellant.

In view of the foregoing we are satisfied that there is no prejudicial error in the record and that there is evidence in the record to support the finding of negligence on the part of appellant.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied Feb. 18, 1954, and appellant's petition for a hearing by the Supreme Court was denied March 17, 1954.