[Civ. No. 46804. Second Dist., Div. One. Mar. 30, 1976.]

DALLAS I. BUCHANAN, JR., et al., Plaintiffs and Appellants, v.
LOS ANGELES COUNTY FLOOD CONTROL DISTRICT,
Defendant and Respondent.

## COUNSEL

Wehrle & Anderson and Trent G. Anderson, Jr., for Plaintiffs and Appellants.

John H. Larson, County Counsel, and Max E. Truex, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**THOMPSON, J.**—This is an appeal from a judgment on a jury verdict rejecting plaintiffs' causes of action for wrongful death based upon negligence in maintenance and operation of a flood control system, defendant's maintenance of a dangerous condition with actual or constructive knowledge of its existence, and for infliction of emotional distress. The appeal is also from a portion of the judgment based upon a nonsuit granted after opening statement on plaintiffs' cause of action for injunctive relief to abate a nuisance. Concluding that the jury was prejudicially misled by instructions given on the court's own motion to the effect that defendant is not liable for a natural condition of drainage and that contrary to the evidence the condition causing the death which is the subject of the lawsuit is a natural one, we reverse the judgment based upon the jury verdict. Concluding, further, that the record does not support the trial court action granting defendant's motion for nonsuit on the cause of action for injunctive relief, we reverse that portion of the judgment also.

### Facts

In 1922, defendant Flood Control District constructed San Dimas Dam, creating a reservoir with a capacity of 1,515 acre-feet. San Dimas Dam impounds the water of San Dimas Canyon Wash. San Dimas Dam

is constructed with controlled gate valves, permitting water to be kept in the reservoir or released into San Dimas Canyon Wash. Also in 1922, the Flood Control District constructed Live Oak Dam across Live Oak Canyon, part of the Puddingstone drainage system, a separate drainage system and watershed from San Dimas Canyon Wash. Live Oak Dam was constructed to impound water in a reservoir with a capacity of 240 acre-feet. It has manually controlled release valves permitting release of water into Live Oak Canyon and the Puddingstone drainage.

In 1926, the Flood Control District constructed Puddingstone Diversion Dam across San Dimas Canyon Wash downstream from San Dimas Dam. Puddingstone Diversion Dam is constructed to impound a capacity of 148 acre-feet of water. It is built with manually controlled gate valves which permit water to be released either into San Dimas Canyon Wash at a maximum rate of 3,500 cubic feet per second (cfs), or to be diverted through a man-made channel into the Puddingstone drainage. The valves at the diversion dam have been regularly operated to control flow to the San Dimas and Puddingstone drainages from 1928 to 1968. In the 1960's, flow to the San Dimas drainage was generally kept small to protect a golf course and access to a subdivision.

Puddingstone Dam was constructed by the Flood Control District in 1928 to impound a reservoir with a capacity of 16,856 acre-feet of water. An outlet channel for Colorado River water was constructed between Live Oak and Puddingstone reservoirs to carry the water to Live Oak Creek and then into Puddingstone.

Manually controlled valves at Puddingstone Dam permit water to be released into Walnut Creek Wash. When water from San Dimas Canyon Wash is diverted by the Puddingstone Diversion Dam into Puddingstone Reservoir and then released, Walnut Creek Wash carries not only the water from its natural drainage but also the water diverted from the other watershed. Originally constructed as a flood control project, Puddingstone Reservoir was also used, by 1968 and 1969, for recreational purposes, including boating, water skiing and fishing. It operated under a permit from the State of California requiring that its water level not be more than 945 feet above sea level except for temporary flood control.

Plaintiffs are lessees and occupiers of a home and surrounding acreage approximately one and three-quarters miles downstream from Puddingstone Dam. The home is on a bluff overlooking Walnut Creek; the edge of the bluff is about 150 yards from the house. A rough sketch of the

various dams and reservoirs and their relation to plaintiffs' residence follows:

NOT TO SCALE

Downstream from the property occupied by plaintiffs, Walnut Creek Wash was paved and improved by the Flood Control District so that it has a carrying capacity of over 1,000 cfs of water. Fencing designed "to keep people out" has been installed along the improved stretch. Opposite the property of plaintiffs, Walnut Creek Wash was protected only by devices called either fences or revetments constructed by the Flood Control District at the request of landowners in the 1950's to protect against erosion from the release of Colorado water imported into Puddingstone Reservoir and released through Walnut Creek Wash to spreading grounds downstream to increase the supply of ground water. The fence-revetments consist of a double row of metal pipes about 11 feet high, driven about 12 inches into the ground. Metal mesh wire is strung along each row of poles. While the fence-revetment structure works best to control erosion when rock and brush are placed between the two rows of wire, the portion along plaintiffs' property was not so filled.

Prior to January of 1969, the maximum amount of water discharged from Puddingstone Dam into Walnut Creek Wash was 300 cfs. That discharge occurred when Colorado River water was imported and an equivalent amount of water was released to charge the spreading basin. When the Colorado River water was discharged, it was the Flood Control District's practice to warn residents and interested public safety agencies of that fact.

In January of 1969, heavy rains fell upon the San Dimas and Puddingstone watersheds. At the beginning of the storm on January 18, Puddingstone Reservoir stood at a level of 936.79 feet above sea level, below the level of 942 feet desirable for recreational purposes. No water was released from the reservoir until January 24. During the period from January 18 until January 24, a large amount of water was diverted from the San Dimas drainage to the Puddingstone drainage by the diversion dam. On January 25, the water level in Puddingstone Reservoir was at 960 feet above sea level, 15 feet above the level permitted by the state permit except for temporary periods, and 10 feet below the spillway of the dam. The Flood Control District began to release water from Puddingstone Dam on January 24. For the next three days, it released water at the rate of between 900 and 1,000 cfs, an unprecedented flow. No warning was given to downstream land occupiers or public safety agencies of the release of water.

Prior to the time the Flood Control District began its release of water at 900-1,000 cfs, the fence-revetment at the property occupied by plaintiffs extended from the ground to a substantial height, giving the appearance and effect of a fence preventing access to Walnut Creek Wash. Prior to that time, the water in the wash was ankle deep. The release of the large quantity of water eroded a hole about three feet in size below the fence-revetment along plaintiffs' property and created a deep pool abutting the property. During the period of the 900-1,000 cfs release, the water in the wash rose to a depth of eight or nine feet.

On February 3, 1969, two-year-old Douglas Buchanan and his twin brother in some fashion made their way out of the walled and enclosed back yard of the residence occupied by their parents. The twins wandered to the fence-revetment where Douglas fell through the eroded hole beneath the fence-revetment and was drowned in the water in Walnut Creek Wash.

The mother, father, and brother of Douglas filed an action for his wrongful death against the Flood Control District, adding a cause of action for injunction. The complaint as amended is framed in five causes of action. The first alleges that the Flood Control District negligently maintained the Walnut Creek Wash channel and the fence-revetment, and created an attractive nuisance. It alleges also that the Flood Control District negligently released water from Puddingstone Dam so as to cause erosion by excessive water flow, and that the district was negligent in not warning of its intended action. Causation in the form of the eroded hole in the fence-revetment is alleged. The first cause of action contains an allegation that the Flood Control District had knowledge of the dangerous condition created by its release of water, of the condition of the "fences," and of the fact that children would be attracted to the wash and could be injured or drowned. Finally, the death of Douglas as a proximate result of the district's conduct is alleged.

The second and third causes of action incorporate the allegations of the first and respectively add the allegation that the death of Douglas was due to the failure of the district to protect against danger of which it had actual and constructive knowledge. The fourth cause of action seeks injunctive relief, alleging that the Flood Control District's manner of discharge of water from Puddingstone Dam and maintenance of the fence-revetments constitutes a nuisance. The fourth cause of action also incorporates the allegations of the first.

The fifth cause of action seeks damages for emotional distress to Douglas' mother caused by his death. On appeal, plaintiffs do not argue that the allegations of the fifth cause of action are legally supported.

Trial of the first, second, third, and fifth causes of action was to a jury with the fourth cause tried simultaneously to the court. The court granted the Flood Control District's motion for nonsuit on plaintiffs' opening statement on the fourth cause of action for injunctive relief. Evidence of the history and manner of operation of the drainage system is essentially unrebutted. Other evidence is conflicting as to the necessity of the Flood Control District's diversion of water from the San Dimas into the Puddingstone drainage and the availability of less dangerous courses of management of the storm water. In substance, the evidence is such as to support a verdict either for or against the district on the first three causes of action.

The trial court instructed the jury on negligence and the ordinary definition of the term. It instructed on the greater duty of care owed to young children, on negligent conduct of public employees, dangerous condition of public property caused by wrongful act or omission of an employee, actual and constructive notice of the dangerous condition, reasonable time for the public entity to take protective measures, and proximate cause.

On its own motion, the trial court instructed on attractive nuisance caused by an "artificial condition" in terms of section 339 of the Restatement Second of .Torts. In the general form of an instruction requested by the district but slightly modified, the trial court instructed: "The artificial condition of diverting water from one watershed into an adjacent watershed becomes the natural condition through the passage of time under California law. Thus, the Flood Control District's diversion of water from San Dimas Canyon into Puddingstone Canyon for a period in excess of 40 years prior to February 1969 had become the natural condition and San Dimas Canyon watershed above San Dimas had become part of the natural watershed of Puddingstone Canyon as of February 1969."

While instructing that there were three plaintiffs in the action and that each plaintiff's case was to be determined separately, the trial court refused an instruction proposed by plaintiffs which states: "You are instructed that if you find against the plaintiffs on any one or several of their causes of action you do not have to find against the plaintiffs on all of their causes of action. Each cause of action is distinct and must be ruled on separately."

The court instructed that the plaintiffs had the burden of proof of establishing negligence, if any, of the defendant, proximate cause, that a dangerous condition of public property existed, notice, and damages.

The jury found for the defendant Flood Control District. On this appeal from a judgment based upon that verdict, plaintiffs contend: (1) the trial court prejudicially erred in instructing that the flow of water from Puddingstone Dam was a natural condition and that plaintiffs could recover on the theory of attractive nuisance or dangerous condition only if the condition were artificial; (2) it erred in refusing plaintiffs' proposed instruction that they need not establish all their theories of recovery but were entitled to recover on any cause of action established by them; (3) the court erroneously refused instructions on the duty of a diverter of water in general and specifically with respect to excessive outflow of water; (4) conduct of the trial interfered with plaintiffs' presentation of their case; and (5) the court erred in granting the nonsuit on the fourth cause of action.

### Artificial or Natural Condition

The trial court instructed on the Flood Control District's liability for negligence of its employees and for maintenance of a dangerous condition created either by the wrongful act or omission of an employee, or as the result of an "attractive nuisance" in the form of an artificial condition. Assuming the instructions on negligence and maintenance of a dangerous condition are correct and that the error in giving an instruction on "attractive nuisance" in the post-*Rowland* v. *Christian* era ((1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; 4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 580) is invited by plaintiffs' pleadings, the focus is on the instruction given on the court's motion to the effect that diversion of water from the San Dimas into the Puddingstone drainage is a natural condition. That instruction precludes the jury from finding negligence based upon lack of due care in the diversion, limiting the jury's consideration to the care exercised by the district after the Puddingstone reservoir was overburdened with the diverted water. It precludes the jury from considering the flow of water and its effect as a dangerous condition maintained by the Flood Control District to the extent the flow is the natural outgrowth of the diversion. Unless the instructions are correct in their statement that as a matter of law the diversion of San Dimas water into the Puddingstone watershed is a natural condition, they foreclose theories of recovery otherwise available under the evidence and are hence prejudicial. (*Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 644 [220 P.2d 897].)

Far from establishing as a matter of law that the diversion of the San Dimas water into the Puddingstone drainage is a natural condition, the evidence establishes without contradiction that the condition is an artificial one.

■ In the context of water law, a permanent man-made condition can become a natural one by the lapse of time. (*Clement* v. *State Reclamation Board, supra,* 35 Cal.2d 628, 638; *San Gabriel V.C. Club* v. *Los Angeles* (1920) 182 Cal. 392 [188 P. 554, 9 A.L.R. 1200]; *Weck* v. *L. A. etc. Flood Control Dist.* (1951) 104 Cal.App.2d 599 [232 P.2d 293].) Then the flow of flood water through the condition, occasioned solely by the "common enemy" of a storm, cannot result in liability. (*Clement* v. *State Reclamation Board, supra,* 35 Cal.2d 628, 636; *Kambish* v. *Santa Clara Valley Water Conservation District* (1960) 185 Cal.App.2d 107 [8 Cal.Rptr. 215].) ■ Where, however, the man-made condition is not a permanent one but rather permits continued control over the flow of water from one watershed to another, the condition is artificial. (*Smith* v. *East Bay Municipal Util. Dist.* (1954) 122 Cal.App.2d 613, 623 [265 P.2d 610]; see also *Chowchilla Farms Inc.* v. *Martin* (1933) 219 Cal. 1, 22 [25 P.2d 435].) In those circumstances, a flood control district is not immune from liability (*Smith* v. *City of Los Angeles* (1944) 66 Cal.App.2d 562 [153 P.2d 69]) for breach of its duty to act with due care in the importation of water from without a watershed into it or in releasing the water. (*Smith* v. *East Bay Municipal Util. Dist., supra,* 122 Cal.App.2d 613, 623.)

■ Here the evidence is conclusive that, by continued operation of the Puddingstone Diversion Dam, the Flood Control District controlled the flow of water from San Dimas Canyon so that it either flowed naturally down San Dimas Canyon Wash or was artificially diverted into the Puddingstone drainage and thence into the Puddingstone Reservoir. The condition so created, including the flow of water from Puddingstone Reservoir necessitated by the importation of San Dimas water, is thus an artificial one.

By precluding the jury from considering the imported water as an artificial condition, the trial court prejudiced a fundamental basis of plaintiffs' cause. By refusing to instruct that plaintiffs need not prove all causes of action alleged by them in order to recover, the trial court exacerbated the error.

### Injunctive Relief

■ Plaintiffs' fourth cause of action alleges the facts of the release of the unprecedented quantity of water, its eroding effect upon the land

occupied by them, and its proximate causation of the death of Douglas. It seeks injunctive relief requiring the Flood Control District to line the banks of Walnut Creek Wash with rock, to give notice at the time water is to be discharged, to refrain from discharging water in excess of Walnut Creek's capacity, to install fencing above the maximum flood line to keep children out of the wash, and to inspect and maintain the channel and fences.

Plaintiffs' opening statement adequately recited the intention to prove facts supporting the allegations of the fourth cause of action. The trial court granted the Flood Control District's motion for nonsuit after the opening statement, thus precluding plaintiffs from introducing evidence on the fourth cause of action. It erred in so doing.

A public entity is not immune from liability for nuisance. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 936-937 [101 Cal.Rptr. 568, 496 P.2d 480].) Physical interference with the enjoyment of land is a nuisance (7 Witkin, Summary of Cal. Law (8th ed.) Equity, § 94) as is a condition which is a danger to the neighborhood. (Witkin, *id.,* § 97.) A private person affected by a private nuisance has standing to bring an action to abate it. (Witkin, *id.* § 102.) A public nuisance may be the subject of an action to abate by a private person only when the nuisance is specially injurious in kind to him. (Witkin, *id.* § 93.)

Here the pleadings and plaintiffs' opening statement disclosed erosion to the land occupied by them through improper activity of the Flood Control District, and hence an interference with their enjoyment of their property. Here the pleadings and opening statement disclosed a condition maintained by the district which was a danger to the neighborhood. As so disclosed, the nuisance was both public and private. (*Venuto* v. *Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 124 [99 Cal.Rptr. 350]; *L. A. Brick etc. Co.* v. *City of Los Angeles* (1943) 60 Cal.App.2d 478, 485 [141 P.2d 46].) Here the pleadings and opening statement disclose that special injury to the plaintiffs not shared by others. Plaintiffs' land was the property particularly subject to erosion and plaintiffs' child and brother was the one drowned as a result of the unprecedented discharge of the water. Thus, whether the nuisance be treated as public or private in character, plaintiffs had standing to sue to abate it.[1]

---

[1]The Flood Control District argues that plaintiffs are barred by laches from seeking injunctive relief because they did not seek a temporary restraining order or preliminary injunction. However, the district shows no change in position.

Concededly the prayer for injunctive relief may seek relief of a character broader than that which a court may fashion. That issue, however, was never reached by the trial court.

### *Disposition*

Plaintiffs' other claims of error raise issues not likely to arise on retrial after the remand of the case at bench once the flow from the diversion dam is recognized as an artificial condition. We thus do not reach those claims in this opinion.

The judgment is reversed.

Wood, P. J., and Lillie, J., concurred.