**Al ACCARDI et al.**

v.

**The UNITED STATES.**

No. 19–76.

United States Court of Claims.

May 16, 1979.

Frederick D. Schwarz, Oakland, Cal., atty. of record, for plaintiffs. Hardin, Cook, Loper, Engel & Bergez, Oakland, Cal., of counsel.

Ronald G. Gluck, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant. Gary B. Randall, Washington, D. C., of counsel.

Before FREEDMAN, Chief Judge, and DAVIS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's motion, filed March 28, 1979, moving that the court adopt as the basis for its judgment in this case the recommended decision of Trial Judge Harry E. Wood, filed January 22, 1979, pursuant to Rule 134(h), neither party having filed a notice of intention to except or exceptions thereto and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby grants defendant's motion and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded as a matter of law that the plaintiffs are not entitled to recover and the petition is accordingly dismissed as to all plaintiffs in accordance with the stipulation that the decision on liability as to the plaintiffs Reo Stott (34) and Mr. and Mrs. Peter Muskin (28) would be binding on all plaintiffs herein.

## OPINION OF TRIAL JUDGE

WOOD, Trial Judge:

In this action, plaintiffs, alleged owners of certain real property along the Trinity River in northern California, contend that in consequence of defendant's operation of the Trinity River division of the Central Valley Project, a flood, and a Fifth Amendment taking of their respective real properties, occurred on or about January 19, 1974, and that they are accordingly entitled to just compensation.[1]

For reasons hereinafter appearing, it is concluded that plaintiffs are not entitled to recover, and that the petition should be dismissed.

### I

The principal purpose of the Trinity River division, authorized by Congress in 1955

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The record does not establish that each of the plaintiffs named in the amended petition herein either was in January 1974, or has been at all times since then, the owner of real property along the Trinity River. At trial, however, it was agreed (1) that trial would be limited to the issues of law and fact relating to plaintiffs' right to recover, reserving determination of the amount of recovery (if any) for further proceedings pursuant to Rule 131(c); (2) that to conserve trial time and expense plaintiffs would present the testimony of only two plaintiffs (plaintiff Reo Stott (34), who has owned a substantial amount of property along the Trinity River since about 1955, and plaintiff Peter Muskin (28), who with his wife has owned land along that river since October 1968); and (3) that the decision on liability herein respecting the real properties owned by Mr. Stott and by Mr. and Mrs. Muskin would be binding on all other plaintiffs and on defendant in further proceedings herein.

as an addition to and an integral part of the massive Central Valley Project, and completed in or about 1964, was to increase the supply of water available for irrigation and other beneficial uses in the Central Valley of California. Although one of the purposes of the Central Valley Project as a whole has been, and is, flood control, the Trinity River division was designed to store and provide water for use in irrigation, the generation of hydroelectric power, and the preservation and propagation of fish and wildlife. Flood control protection was not one of the stated purposes of the division, and it is not, and has not been operated as, a flood control project.

The major features of the division include Trinity Dam and Powerplant, and Clair Engle Lake (formerly Trinity Reservoir) behind Trinity Dam; Lewiston Dam and Powerplant, and Lewiston Reservoir, some 7 miles down the Trinity River from Trinity Dam; and Clear Creek Tunnel.[2] Plaintiffs'[3] land is situated along the Trinity River, approximately 5 miles downstream from Lewiston Dam, in an area commonly known as Poker Bar.

Trinity Dam is designed to store, at elevation 2,370.0 feet above mean sea level (m. s. l.), some 2,448,000 acre-feet of water. Trinity Dam's crest is at elevation 2,395.0 m. s. l. The dam has a so-called surcharge space (*i. e.,* an additional 17 feet of space above elevation 2,370.0 m. s. l.) having a water storage capacity of 292,000 acre-feet, and an additional 8 feet of space (having a water storage capacity of 140,000 acre-feet) between elevation 2,387.0 m. s. l. and the crest of the dam. The 8-foot high space just below the crest of the dam operates as a safety factor as well.

Trinity Dam has main and auxiliary outlet works having a combined capacity of 9,700 cubic feet of water per second (c. f. s.); releases of water through these outlet works can be shut down. It also has a "morning glory" type spillway, or hole, at elevation 2,370.0 m. s. l. The morning glory hole, which is designed to be and is incapable of being closed, has a maximum capacity of 22,500 c. f. s. When the surface level of the water stored behind Trinity Dam is below elevation 2,370.0 m. s. l., no water flows through the morning glory hole.

When the level of water stored behind Trinity Dam exceeds elevation 2,370.0 m. s. l. (or, in slightly different terms, when Clair Engle Lake contains more than 2,448,000 acre-feet of water), however, water flows through the morning glory hole uncontrolled.[4] As the lake's surface water level rises above elevation 2,370.0 m. s. l., water pressure (or a head) builds up, and water flows through the morning glory hole at increasing rates. When the lake's surface water level reaches elevation 2,387.0 m. s. l. (*i. e.,* when there is a 17-foot surcharge), 22,500 c. f. s. will flow through the morning glory hole. Maximum releases of water from Clair Engle Lake through Trinity Dam's main and auxiliary outlet works, and its morning glory hole, of about 30,000 c. f. s. or so are possible.[5]

All of the water released through Trinity Dam flows down the Trinity River into Lewiston Reservoir. Because Lewiston Reservoir has a water storage capacity of only 14,660 acre-feet of water, and is normally kept nearly full, any water entering that reservoir will pass either through Clear Creek Tunnel (and, eventually, into the Sacramento River), or through Lewiston Dam and on down the Trinity River. Any releas-

2. The intake structure to Clear Creek Tunnel is located in Lewiston Reservoir. The tunnel, with a maximum flow capacity of about 3,300 cubic feet per second (c. f. s.) diverts water from Lewiston Reservoir through three large powerplants via a series of reservoirs, dams, tunnels and conduits; the water so diverted eventually flows into the Sacramento River.

3. Here, and hereinafter, the term "plaintiffs" means plaintiffs Stott and Muskin, except where otherwise indicated.

4. One cubic foot of water per second for 24 hours equals 1.983 acre-feet of water.

5. Although the separate numbers involved do not add up mathematically to 30,000 c. f. s.,

es of water through Trinity Dam in excess of 3,300 c. f. s.[6] are virtually certain to flow through Lewiston Dam, into the Trinity River, and by plaintiffs' Poker Bar properties some 5 miles downstream from Lewiston Dam.

Among other things, the 1955 legislation authorizing construction of the Trinity River division specifically provided that, "to insure the preservation and propagation of fish and wildlife," the Secretary of the Interior should maintain "the flow of the Trinity River below the diversion point at not less than one hundred and fifty cubic feet per second for the months July through November * * * unless the Secretary and the California Fish and Game Commission determine and agree that lesser flows would be adequate for maintenance of fish life and propagation thereof * * *."[7] In 1959, the Bureau of Reclamation and the California Department of Fish and Game entered into an agreement respecting streamflow maintenance of the Trinity River at 150–250 c. f. s. at all times. While there have been revisions of the agreement (in terms of the amount of monthly flow) from time to time thereafter, Trinity River streamflow has never been less than the amount so agreed upon for maintenance and propagation of fish life.[8]

Following completion of the Trinity River division in about 1964, the Bureau of Reclamation did not operate it to provide complete flood control protection to persons and property along the Trinity River downstream of Lewiston Dam. One government objective to and after January 1974 was, rather, that the amount of water stored in

Clair Engle Lake should increase during the wet winter months, in order that, during the drier summer months, water from the lake would still be available for fish and wildlife, power, irrigation and other purposes. Another was that, at the beginning of the wet winter months, Clair Engle Lake would contain only some 1,800,000 to 1,900,000 acre-feet of water, in anticipation of inflow shortly thereafter.

In operational terms, the applicable governmental policy was to release, on a year-round basis, from 150 to 250 c. f. s. of water to the Trinity River for fish and wildlife purposes to store all water in excess of such releases for diversion through Clear Creek Tunnel, and to divert, again on a year-round basis, up to some 3,300 c. f. s. of water through that tunnel (and three large powerplants) and ultimately into the Sacramento River. That policy, which resulted in the production of significant amounts of both hydroelectric power and resultant revenues, did not expressly incorporate any provision for the continuous, year-round, availability of specific amounts of space in Clair Engle Lake for the storage of potential storm waters. Nonetheless, the conservation and control of water contemplated (and accomplished) by construction of the Trinity River division necessarily resulted in an incidental flood control benefit on the Trinity River downstream of the division.[9]

Severe storms struck the Trinity River Basin in 1964, in 1970, and again in 1974.[10] A dry season had preceded the 1964 storm, and the level of water stored in Clair Engle Lake was therefore low. Despite a peak inflow of 84,100 c. f. s. and a mean daily

this statement accurately reflects the evidence in the record.

6. The maximum actual flow capacity of Clear Creek Tunnel.

7. The Trinity River was, and is, one of California's most famous fishing streams.

8. As will be seen, Trinity River streamflow has on occasion been much greater than 250 c. f. s.

9. In 1975, the Bureau of Reclamation adopted a new policy of making releases from Clair Engle

Lake whenever the amount of water stored in the lake during the winter months exceeds 2,050,000 to 2,060,000 acre-feet. That change was made from the standpoint of dam safety, not to prevent future flooding downstream on the Trinity River. The effect of the change, however, was to provide even greater incidental food control protection benefits downstream than had theretofore existed.

10. A flood had also occurred in the area in 1955, prior to the commencement of construction of the Trinity River division.

inflow of 74,790 c. f. s. into the lake,[11] the amount of water released through Lewiston Dam to the Trinity River was maintained at a constant level of 200 c. f. s. While plaintiff Stott's property suffered some flood damage as a result of the 1964 storm, that damage necessarily resulted from causes other than the release of water through Lewiston Dam and on down the Trinity River.

In January 1970, another large storm struck the Trinity River Basin. During the months immediately preceding the storm, the amount of water stored in Clair Engle Lake had gradually increased. Although most of the January 1970 storm water was retained in the lake, a surcharge buildup occurred, and in turn resulted in a peak release of approximately 7,000 c. f. s. of water[12] through the Trinity Dam morning glory hole and Lewiston Dam into the Trinity River. That rate of release was, however, only one-seventh of the peak inflow of 49,600 c. f. s. into the lake during the 1970 storm. Had Trinity Dam not been in operation at that time, the entire inflow then recorded would necessarily have flowed down the Trinity River and by the Poker Bar area.

Notwithstanding the 1964 flood damage to his property and the 1970 flood, plaintiff Stott testified that both during and after construction of the Trinity River division, he believed that Trinity Dam would provide his property at Poker Bar with protection from flooding. In any event, the record is clear that, in selling parcels of land in the

Poker Bar area between 1963 and 1974,[13] plaintiff Stott expressed the view that because of the presence of Trinity Dam and Lewiston Dam there would be no flooding of the Trinity River in the Poker Bar area. That view was a plainly erroneous one.

In the period October 1973–January 1974, a considerable amount of precipitation fell in the Trinity River Basin. During that period a total of some 1,239,000 acre-feet of water flowed into Clair Engle Lake. Some 3 or 4 days prior to January 12, 1974, a satellite photograph showed a storm approaching the west coast, but there was no way of predicting at that time where the storm might go, and whether it might strike the Trinity River Basin.

The storm not only struck, but stalled over, the basin. Rain started to fall in the basin January 12, 1974. Between January 12 and 19, 1974, 10.2 inches of rain fell on the basin, with more than 5 inches of that rain falling within one 24-hour period.[14] The surface level of the water stored in Clair Engle Lake gradually rose. By January 16 it reached elevation 2,375.24 m. s. l., 5.24 feet above the level of the morning glory hole in Trinity Dam, and water began to flow through the morning glory hole into Lewiston Reservoir, through Lewiston Dam, and into the Trinity River.

In the January 1974 storm, Clair Engle Lake experienced a peak inflow (between 7:00 and 8:00 a. m., January 16) of 107,700 c. f. s.,[15] a mean daily inflow of 72,500 c. f. s., and a 6-day total inflow of 367,200 acre-

11. Peak inflow was defined as the instantaneous point in time at which the maximum amount of water flowed into Clair Engle Lake. A "six-day total" inflow of 400,800 acre-feet of water was recorded in 1964. Both the mean daily inflow and the "six-day total" inflow recorded in 1964 were and are the highest ever recorded. The 1964 peak inflow was exceeded in 1974.

12. January 1970 releases to the river at that rate occurred for a brief period on one day. A mean daily inflow of 39,100 c. f. s., and a "six-day total" inflow of 285,300 acre-feet of water, were recorded in January 1970. The record does not reflect that either plaintiff Stott's or Mr. and Mrs. Muskin's Poker Bar real property suffered any damage in January 1970,

and in any event none of the plaintiffs named in the amended petition asserts a claim of taking in 1970.

13. Plaintiff Stott sold a considerable number of parcels of land in the Poker Bar area between about 1958 and January 1974.

14. On January 12, 1974, Clair Engle Lake contained about 2,309,000 acre-feet of water (some 139,000 acre-feet less than the lake's gross storage capacity, at elevation 2,370.0 m. s. l., of 2,448,000 acre-feet), and the water level in the lake was at about elevation 2,361.40 m. s. l.

15. This was and is the highest peak inflow into the lake ever recorded.

feet of water. From the morning of January 16, when water first started to flow through the morning glory hole in Trinity Dam,[16] to about 11:30 p. m., January 18, 1974, when the peak releases of water through Trinity Dam to the Trinity River (at a rate of about 14,800 c. f. s.) occurred, such releases to the river gradually increased. Releases at that rate lasted for about 30 minutes, then gradually declined over a period of several days. By January 31, 1974, releases had diminished to about 2,000 c. f. s., and by February 9, 1974, they had ceased.[17]

The availability of some 124,000 acre-feet of storage space (below elevation 2,370.0 m. s. l.) at midnight, January 14, 1974, the availability of surcharge space above elevation 2,370.0 m. s. l. in Clair Engle Lake, and a shutdown of the powerplant in Trinity Dam for 4 or 5 days during the January 1974 storm, delayed peak releases of storm waters down the Trinity River by almost two full days.[18] Moreover, while the peak inflow into Clair Engle Lake during that storm was 107,700 c. f. s., and the "six-day total" inflow then recorded was 367,200 acre-feet, the flow through Trinity Dam down the Trinity River peaked at 14,800 c. f. s., or less than 15 percent of the recorded peak inflow. Had Trinity Dam not been in operation in January 1974, both the peak inflow and the entire inflow then recorded would necessarily have flowed down the Trinity River. That the peak inflow, and a substantial portion of the total inflow,[19] did not do so resulted from the presence of the dam, and its retentive and delaying effect upon storm waters.

The 1974 flood washed away one of plaintiff Stott's bridges in the Poker Bar area, and severely damaged another. A water pump belonging to plaintiff Stott also washed away in the 1974 flood, and at least some of his property along the river suffered severe soil erosion. Most of Mr. and Mrs. Muskin's land was covered by water during the 1974 flood, and severe soil erosion occurred on their property.

## II

Plaintiffs assert that defendant's "action as established by the facts of this case has resulted in a taking of [plaintiffs'] property by reason of the past and future flooding resulting from authorized government activity." In support of this broad assertion, plaintiffs urge that because of defendant's failure to have sufficient storage space behind Trinity Dam to prevent "foreseeable storms" of the magnitude of the storm that occurred in January 1974 from resulting in flood conditions; plaintiffs' justifiable "reliance upon the government policy of maintaining a low release rate of approximately 150 cfs to the Trinity River without exception"; and governmental admissions "that similar flood conditions as occurred in January of 1974 could and will occur again at even higher levels if conditions develop", a compensable taking should be found.

Defendant denies any taking, asserting that but for the Trinity River division the January 1974 flood would have had even greater impact on plaintiffs' property than it did, and that plaintiffs have not only not been injured by, but have in fact benefited from the presence and operation of the Trinity River division. It further contends

16. The January 1974 storm caused flooding in the Sacramento River Basin. On the morning of January 16, 1974, defendant, to avoid adding to that flooding, shut down the diversion of water through Clear Creek Tunnel. The decision necessarily resulted in additional water going down the Trinity River. Diversions through the tunnel resumed about January 21, 1974.

17. Normal fish and wildlife releases continued to be made.

18. Had an additional 300,000 acre-feet of storage space been available in Clair Engle Lake prior to January 16, 1974, it would not have been necessary to release any of the January 1974 storm waters through Trinity Dam down the Trinity River; in that event, all of such storm waters could have been stored in Clair Engle Lake.

19. In January and February 1974, only 228,770 acre-feet of water were released as "spill"; additional precipitation of more than an inch fell January 31 and February 1.

that plaintiffs have in any event failed to prove an inevitably recurring inundation of their real property due to governmental action.

■ Where a claim of taking of private property for a public use is founded upon interference with land due to flooding, the burden of proving the claim consists of more than a mere showing that governmental action "has interfered with property rights." *Bryant v. United States,* Ct.Cl., 578 F.2d 1389 (1978); *Fromme v. United States,* 412 F.2d 1192, 188 Ct.Cl. 1112 (1969). In general terms, where no permanent flooding of the land is involved, proof of frequent and inevitably recurring inundation due to governmental action is required. *Ibid*; see also *Barnes v. United States,* 538 F.2d 865, 870–71, 210 Ct.Cl. 467, 474–76 (1976); *Hartwig v. United States,* 485 F.2d 615, 620, 202 Ct.Cl. 801, 809–10 (1973); *National By-Products, Inc. v. United States,* 405 F.2d 1256, 1272–74, 186 Ct.Cl. 546, 575–78 (1969).

■ On this record, plaintiffs have failed to establish that their real properties in the Poker Bar area along the Trinity River have been since 1974, or will be at any time in the future, subjected to frequent and inevitably recurring overflows of water in consequence of the construction and operation of the Trinity River division. All else aside, the governmental "admissions" cited by plaintiffs as amounting to a taking no more than recognize the effects of the possible occurrence of a standard project flood whose probability would be in the vicinity of once in every 400 to 500 years. They fall far short of proving frequent and inevitably recurring overflows.[20] *Bryant v. United States, supra; Fromme v. United States, supra; National By-Products, Inc. v. United States, supra.* There is another insuperable barrier to plaintiffs' recovery here.

■ While plaintiffs' property undoubtedly suffered some damage during the January 1974 flood, it is clear that defendant "does not owe compensation under the Fifth Amendment to every landowner which it fails to or cannot protect." See *United States v. Sponenbarger,* 308 U.S. 256, 265, 60 S.Ct. 225, 228, 84 L.Ed. 230 (1939); see also *Bryant v. United States, supra; Ark-Mo Farms, Inc. v. United States,* 530 F.2d 1384, 209 Ct.Cl. 116 (1976); *Hartwig v. United States, supra,* 485 F.2d at 621, 202 Ct.Cl. at 811–12. That Amendment does not make defendant "an insurer that the evil of floods be stamped out universally before the evil can be attacked at all", by way of a flood control project. *United States v. Sponenbarger, supra,* 308 U.S. at 266, 60 S.Ct. at 229. Nor does it require that defendant be a guarantor against all future flooding in connection with the construction of projects having other purposes. *Hartwig v. United States, supra.*

Had Trinity Dam not been in operation in January 1974, plaintiffs' real properties in the Poker Bar area would have experienced the full force of a peak inflow of 107,700 c. f. s., and of a mean daily inflow of 72,550 c. f. s. of water. In fact, however, those properties experienced releases of water through Trinity Dam (and Lewiston Dam) of no more than 14,800 c. f. s. of water, with releases at that level persisting for less than 30 minutes.

■ Even taking into account changes in the bed or channel of the Trinity River below Lewiston Dam following 1964,[21] plaintiffs have wholly failed to show that defendant's construction or operation of the

20. But for the presence and effect of the Trinity River division, a standard project flood would result in a peak discharge of about 202,000 c. f. s. of water down the Trinity River. Should a standard project flood ever occur in the Trinity River Basin, however, it would in fact cause a peak discharge at Lewiston Dam of only about 29,000 c. f. s.

21. With the flow of the river slowed to 150–250 c. f. s. following 1964, sediment has gradually accumulated in the bed or channel of the river. By 1974 it was somewhat less deep below Lewiston Dam than it had been prior to completion of the Trinity River division. The evidence contains no basis, however, for any real conclusions respecting the effect of sedimentation on various rates of flow of water down the Trinity River.

Trinity River division subjected their lands to any additional flooding above what would have occurred in consequence of the severe January 1974 storm had defendant not constructed the division at all. Indeed, it is fair to find from this record that the flooding which actually occurred in consequence of that storm was far less than would have been the case had the Trinity River division never been built. In these circumstances, there has been no taking of plaintiffs' property. *United States v. Sponenbarger, supra; Bryant v. United States, supra; Hartwig v. United States, supra.* This too "is a case of at most 'little injury in comparison with far greater benefits conferred.'" [Citation omitted.] *Ark-Mo Farms, Inc. v. United States, supra,* 530 F.2d at 1386, 209 Ct.Cl. at 119.

■ Plaintiffs suggest that a different result would nonetheless be appropriate here, however, because of their assertedly justifiable reliance, in purchasing and developing their Poker Bar properties, upon "the government policy of maintaining a low level release rate of approximately 150 cfs to the Trinity River without exception." In view of the facts and circumstances in this record, there are grave difficulties with plaintiffs' factual position. Those difficulties may, however, presently be pretermitted. Plaintiffs' legal position is plainly contrary to the rationale of *Sponenbarger* and repeated decisions in this court, and accordingly must be rejected. Plaintiffs' reliance on the decision in *Smith v. East Bay Municipal Utility District,* 122 Cal.App.2d 613, 265 P.2d 610 (1954), cited as justifying an exception to *Sponenbarger* in a situation where a landowner has come to rely upon a controlled flow which is subsequently altered, is wholly misplaced.

In *Smith v. East Bay Municipal Utility District, supra,* suit was brought to recover damages suffered in consequence of alleged negligence in the utility district's operation of San Pablo Dam and Reservoir. Prior to and throughout a storm, the utility district diverted water from Pardee Dam and Reservoir into San Pablo Reservoir. In sustaining on appeal a jury verdict holding the utility district liable for flood damage to property downstream from San Pablo Reservoir, the court found evidence from which "the jury could infer that more water was released from the dam than naturally flowed into the dam from San Pablo Creek"; the diversion of "foreign waters * * * into the reservoir when they must of necessity have increased the amount of water being discharged from the reservoir" was held to be a sufficient basis for a jury verdict of negligence and breach of duty on the part of the utility district. *Id.* 122 Cal.App.2d at 622–23, 265 P.2d at 616.

Even assuming the duty recognized by the court in *Smith v. East Bay Municipal Utility District* to be applicable to defendant, the facts of this case show clearly that defendant could not be held liable for a breach of any such duty. The utility district's actions caused larger releases of water downstream of San Pablo Dam than would have occurred naturally. Here, however, the amount of water which flowed down the Trinity River during the January 1974 flood was far less than the amount which flowed into Clair Engle Lake during that storm.

■ Plaintiffs also charge that defendant's failure to maintain sufficient storage space in Clair Engle Lake to impound assertedly "foreseeable" storm waters amounts to a taking of their property. *Cf. Hartwig v. United States, supra,* 485 F.2d at 618, 202 Ct.Cl. at 806. The question of foreseeability is far from settled by plaintiffs' proof. Moreover, to the extent plaintiffs' argument rests upon governmental negligence or mismanagement as a basis for recovery here, no cause of action cognizable in this court is stated.[22] *Ibid.*

Jurisdictional, and other, considerations aside, however, the charge is in any event an untenable one (*Hartwig v. United States, supra,* 485 F.2d at 621, 202 Ct.Cl. at 811–12):

---

22. There is here no suggestion whatever that Section 1506, Title 28, United States Code (1976 ed.) should be invoked.

\* \* \* The court can see no reason why the defendant should be required to pay for failing to take certain actions which hindsight tells us might have made the dam system even more beneficial in controlling floods, when it was under no obligation to save the downstream landowners harmless from the potential floods at the risk of having inadequate supplies of water for the beneficial irrigation and power purposes for which the system had originally been constructed, and for which purposes the defendant was legally obligated to operate the system. [Footnote omitted.]

In light of the foregoing, it is concluded that plaintiffs Stott (34) and Muskin (28) are not entitled to recover. Pursuant to that conclusion, and to the stipulation of the parties that the decision on liability as to those plaintiffs would be binding on all other plaintiffs (and defendant) herein, it is further concluded that the petition should be dismissed.

CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that neither Mr. Stott's nor Mr. and Mrs. Muskin's real property in the Poker Bar area has been taken by defendant, within the meaning of the Fifth Amendment, that the said plaintiffs are not entitled to recover, and that the petition is accordingly dismissed as to them.

Pursuant to the foregoing conclusion and a stipulation that the decision on liability as to those plaintiffs would be binding on all other plaintiffs herein, the petition is accordingly dismissed as to all plaintiffs.